IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| KIMBERLY MARTÍNEZ-RIVERA<br><br>**Plaintiff**<br><br>v.<br><br>**HON. ROSAMAR TRUJILLO-PLUMEY**, in her personal and official capacity as Mayoress of the Municipality of Humacao and president of the Head Start Program Governing Board of the Municipality of Humacao; **MR. ORLANDO CINTRÓN-NEGRÓN**, in his personal and official capacity administrator of the Municipality of Humacao; **YOJARIS CRUZ-CASTRO**, in her personal and official capacity as member of the Head Start Program Governing Board; **ROSE NIEVES**, in her personal and official capacity as member of the Head Start Program Governing Board; Antonia Morales-Concepción, in her personal and official capacity as member of the Head Start Program Governing Board; **EDWIN LÓPEZ-NIEVES**, in his personal and official capacity as member of the Head Start Program Governing Board; **IZAEL O. SANTIAGO**, in his personal capacity and official capacity as Municipal Secretary; **LUIS MATOS**, in his personal capacity and official capacity as Advisor to the Mayor on Federal Programs X, Y, and Z insurance companies with coverage for liability for any Defendant; and A, B, and C as yet unidentified persons responsible for civil rights violations against Plaintiffs.<br><br>**Defendants** | CASE NO. 26-1102<br><br>CIVIL ACTION<br><br>42 U.S.C. § 1983<br><br>42 U.S.C. § 1988<br><br>CIVIL RIGHTS<br><br>JURY TRIAL REQUESTED |

**COMPLAINT**

**TO THE HONORABLE COURT**:

   **NOW COME**, the Plaintiff, through the undersigning counsel, and respectfully alleges and prays as follows:

**I.   INTRODUCTION**

-1-

1. The Plaintiff in the present action was a public employee of the Head Start Program in the Municipality of Humacao (hereinafter "Head Start Program" or "the Program"), who was grossly and personally discriminated against for her political believes by Defendants. Indeed, specific evidence establishes that the sole and exclusive motive behind her dismissal was that she had supported the former mayor of the Municipality of Humacao (hereinafter "the Municipality" or "Humacao"), and the New Progressive Party (hereinafter "NPP"). Plaintiff was promptly substituted with a political activist loyal to the new Mayoress and her Popular Democratic Party (hereinafter "PDP").

## II.   JURISDICTIONAL STATEMENT

1. This is a civil action filed a former employee of the Head Start Program in the Municipality of Humacao (hereinafter "the Municipality"), that following the general elections of November 5, 2024, was dismissed without cause by the new Mayoress, Defendant Rosamar Trujillo-Plumey (hereinafter "Trujillo-Plumey"), simply because she was an identified member of the NPP. Plaintiff alleges a violation of her First Amendment, Due Process and Equal Protection rights under the Constitution of the United States, as well as under the laws and Constitution of Puerto Rico, and prays equitable relief in the form of reinstatement, and legal relief in the form of economic and punitive damages, pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1983.  As this is a civil action brought pursuant to the laws and Constitution of the United States, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  This Court also has supplemental jurisdiction over all claims arising under of the laws and Constitution of Puerto Rico pursuant to 28 U.S.C. § 1367.  Venue is proper under 28 U.S.C. § 1391(b).

## III.   THE PARTIES

2. Plaintiff in the present action is a citizen of the United States, resident of Puerto Rico,

former employee of the Municipality and a supporter of the NPP.

3. All Defendants know and are aware of Plaintiff's political affiliation due to her political activism, her vocal identification with the NPP, her work in support of the previous Mayor, Julio Geigel-Pérez (hereinafter "Geigel-Pérez"), who was and remains the municipal president of the NPP, and in furtherance of his reelection campaign, and through common knowledge in the Municipality. Plaintiff was appointed to her position at the Program in the Municipality on March 1, 2022.

4. Plaintiff was dismissed and replaced with someone affiliated with the PDP, of which Trujillo-Plumey is the municipal president and under which ticket she successfully ran for mayor in the 2024 general elections. Fellow Defendants are also all identified with the PDP.

5. The Plaintiffs is **Kimberly Martínez-Rivera** (hereinafter "the Plaintiff" or "Martínez-Rivera"), the former Director of the Head Start Program in the Municipality since March 1, 2022, with an excellent performance record, and address HC Box 6427, Las Piedras, Puerto Rico 00771.

6. Plaintiff was effectively dismissed from her position on May 30, 2025, only 4 months after the inauguration of Defendant Trujillo-Plumey. Plaintiff was not given any previous notice of her dismissal. Plaintiff was informed that her employment contract would not be renewed after May 31, 2025, by a letter dated May 30, 2025. Moreover, Defendant Trujillo-Plumey, who was at the time of dismissal the nominating authority at the Municipality, asked on several occasions for Plaintiff's vote and support but was personally rebuffed because she supported the NPP and its candidate.

7. Plaintiff never performed functions involving the shaping or modification of public policy or functions that could influence or be considered in close propinquity to policy making employees or otherwise had access to confidential information.

8. Neither the Defendants nor their agents reviewed or evaluated the Plaintiff's performance prior to the decision to suspend and dismiss her. Never was the Plaintiff given any reprimand by

-3-

the Trujillo Plumey administration, nor was she afforded her due process before the Governing Board and the Policy Council.

9. Plaintiff is a well-known activist and supporter of the NPP, she was identified with the NPP within the Municipality, and worked in the NPP municipal campaigns.

10. Plaintiff was replaced in her position at the Head Start Program in the Municipality with a supporter of the PDP.

11. Defendant **Trujillo-Plumey**, is included in her personal and official capacity as Mayoress of the Municipality. She has held the position Mayoress of the Municipality of Humacao since January of 2025, and during all pertinent times to this Complaint. Prior to assuming the mayorship, Trujillo-Plumey served as Senator for the district encompassing the municipalities of Caguas, Gurabo, Humacao, Juncos, Las Piedras, Manuabo, Naguabo, Patillas, San Lorenzo and Yabucoa. Trujillo-Plumey's father, Hon. Marcelo Trujillo-Panisse, served as mayor of Humacao between 2001 and 2019.

12. The address of the Municipality is Calle Efraín Meléndez Arroyo, 2do Piso, Centro de Gobierno Municipal Atanasio Martínez Díaz, with postal address P.O. Box 178, Humacao, P.R. 00792-0178.

13. Defendant **Rose Nieves** is included in her personal and official capacity as member of the Head Start Program Governing Board of the Municipality of Humacao. She has held that position during all pertinent times to this Complaint. The address of the Municipality is Calle Efraín Meléndez Arroyo, 2do Piso, Centro de Gobierno Municipal Atanasio Martínez Díaz, with postal address P.O. Box 178, Humacao, P.R. 00792-0178.

14. Defendant **Antonia Moralez-Concepción** is included in her personal and official capacity as member of the Head Start Program Governing Board of the Municipality of Humacao. She has held that position during all pertinent times to this Complaint. The address of the Municipality is Calle Efraín Meléndez Arroyo, 2do Piso, Centro de Gobierno Municipal Atanasio Martínez Díaz,

with postal address P.O. Box 178, Humacao, P.R. 00792-0178.

15. Defendant **Edwin López-Nieves** is included in her personal and official capacity as member of the Head Start Program Governing Board of the Municipality of Humacao. She has held that position during all pertinent times to this Complaint. The address of the Municipality is Calle Efraín Meléndez Arroyo, 2do Piso, Centro de Gobierno Municipal Atanasio Martínez Díaz, with postal address P.O. Box 178, Humacao, P.R. 00792-0178.

16. Defendant **Orlando Cintron Negron** is included in his personal and official capacity as administrator of the Municipality of Humacao. He has held that position during all pertinent times to this Complaint. The address of the Municipality is Calle Efraín Meléndez Arroyo, 2do Piso, Centro de Gobierno Municipal Atanasio Martínez Díaz, with postal address P.O. Box 178, Humacao, P.R. 00792-0178.

17. Defendant **Izael O. Santiago** is included in her personal and official capacity as member of the Head Start Program Governing Board of the Municipality of Humacao. She has held that position during all pertinent times to this Complaint. The address of the Municipality is Calle Efraín Meléndez Arroyo, 2do Piso, Centro de Gobierno Municipal Atanasio Martínez Díaz, with postal address P.O. Box 178, Humacao, P.R. 00792-0178

18. Defendant **Luis Matos** is included in her personal and official capacity a member of the Head Start Program Governing Board of the Municipality of Humacao and as Advisor on Federal Programs to the Mayor. The address of the Municipality is Calle Efraín Meléndez Arroyo, 2do Piso, Centro de Gobierno Municipal Atanasio Martínez Díaz, with postal address P.O. Box 178, Humacao, P.R. 00792-0178.

19. All Defendants are well-known supporters and members of the PDP.

20. The **Defendant Municipality** is a unit of local government duly instituted pursuant to Local Law No. 107 of August 20, 2020, also known as the "Municipal Code of Puerto Rico". 21 L.P.R.A. § 7001 *et seq*. The Municipality is considered a person for the purposes of 42 U.S.C.A.

§ 1983. As per the aforementioned Municipal Code, the Municipality has the legal capacity to sue and be sued.

21. Defendants X, Y, and Z are still unidentified insurance companies with coverage for liability for any Defendant; and Defendants A, B, and C are as yet unidentified persons responsible for civil rights violations against Plaintiffs.

### IV. STATEMENT OF FACTS

22. On November 5, 2025, Puerto Rico held general elections for all elected positions in government, in both the Executive and legislative branches. To wit, the elections held included governor, resident commissioner, all members of the Senate and House of Representatives, (both at district level and at-large), all 78 mayors and 78 municipal legislatures. Political affiliation is commonly discussed and stated between personnel in government offices, particularly in the Municipality where people are not only co-workers but neighbors and life-long friends or acquaintances. The political atmosphere described was further aggravated by the election season and the highly contested race for the position of mayor. It was customary for employees at the Municipality and the Program, where Plaintiff worked at the time, to express their support for their respective parties and candidates in any number of ways, including comments, conversations, and even the use of their party's colors in clothing, with PDP supporters using red and white and NPP supporters using blue and white. Moreover, the Plaintiff not only saw fellow co-workers at the Municipality and the Program during work hours but often in the town of Humacao while they were participating in activities for their respective parties and candidates. The political affiliation of most municipal employees is commonly known. In particular, Plaintiff was identified with the NPP. Plaintiff was further identified with the NPP because she had been appointed under an NPP administration and she had served as a polling station official representing the NPP on several occasions. Moreover, Plaintiff's father is a well-known political activist in the Municipality and the surrounding areas and is particularly well known to Defendants for having been affiliated with

the PDP and publicly crossing the aisle and changing his affiliation and support to the NPP.

23. The results of the 2025 general elections rendered a narrow and contested victory for the PDP in the Municipality. Geigel-Pérez, the incumbent and NPP candidate for reelection, lost to Defendant Trujillo-Plumey, the PDP candidate, who became Mayor-Elect. The final tally showed a difference of 425 votes between the PDP and the NPP candidates, out of more than 19,000 votes cast.[1] Political expression and discussion was particularly heightened during the 2024 campaign season because of the anticipated close elections. Heightening the political atmosphere and contention even more, the small margins and complications in the processing of absentee ballots caused uncertainty in the results of the municipal elections until mid-December of 2024 and litigation concerning the transition process. The 2024 municipal elections also resulted in an overwhelming PDP majority in the Humacao Municipal Legislature.

24. Immediately following the general elections, municipal employees affiliated with the PDP began telling the Plaintiff that she would be dismissed as soon as Defendant Trujillo-Plumey took power.

25. Plaintiff Martínez-Rivera began working at the Head Start Program in Humacao on March 1, 2022. Since January of 2013, the Plaintiff had been the Director in the Municipality of Las Piedras.

26. The Head Start Program (hereinafter "the Program"), functions under the Department of Health and Human Services of the United States (hereinafter "HHS"). The purpose of the Program is to provide early childhood education, health, nutrition and parent involvement services to low-income families and their children. Funding is provided by the HHS and administered by the participating local government unit, in this case the Municipality. In accordance with the aforementioned policy and regulation requirements, the Program establishes that at a minimum,

---

[1] Information taken from the Puerto Rico State Election's Commission.

the grantee agency - i.e. the Municipality - must ensure that the functions of program management (the director), early childhood development and health services management, and family and community partnership management are covered. 45 C.F.R. § 1304 (a) (2).

27. The Head Start programs are administered under a model of shared governance in which a policy council made of parents and community representatives shares responsibility with the governing board for key decisions. This is one of the fundamental principles of the Program since its inception in the 1960's. In the Municipality, the governing council of the Program is composed of the members of the Municipal Legislature. However, the role of the members of the Program's governing body is separate and independent from their role as Municipal Legislators. However, the role of the members of the Program's governing body is separate and independent from their function as Municipal Legislators, and it is currently not fully constituted. The Head Start Program does not know who is responsible for each area, nor who comprises the Municipal Secretary and the Administrator. Additionally, the minutes of the Board meetings are not provided.

28. decisions as the Program's governing body do not equal a municipal ordinance.

29. With regards to hiring and firing of Program personnel, the Head Start Performance Standards for Program Governance specifically mandate that the policy council and committee must work in partnership with the key management staff and governing body to approve or disapprove, among other things, the decisions to hire or terminate the Program director. 45 C.F.R. § 1304.50 (d) (1) (x).

30. As Director, the Plaintiff worked mainly in the day-to-day administration of the Program. The position of "director" of the Head Start Program requires skills in a management capacity relevant to human services program management. 45 C.F.R. § 1304.52 (c). This requirement highlights that the director's tasks are managerial in nature and not related to public policy.

31. Also, in a letter issued by Gliseria Vitale, the Branch Manager for the New Jersey/Caribbean Division of the Office of Family Supportive Services of the HHS dated April

11, 2001, she pointed out to Mario Moreno, the director of the Head Start Program in Puerto Rico that it had come to her attention that working contracts for Head Start staff were being modified in violation of the applicable Performance Standards. In the letter, the nature of Head Star personnel employment was summarized in the following terms:

> Federal Head Start regulations are written to ensure that Head Start personnel positions are permanent. This is why many Head Start programs have been able to employ and retain experienced and well-trained employees, who become the foundation for high quality programs. Head Start employees are permanent employees, after a probation period, contingent upon the continuation of Federal funding. Notwithstanding local personnel policies, the working agreement should include a clause to attest that Head Start employees are permanent unless Federal funding is discontinued. Letter signed by Gliseria Vitale, Branch Manager for New Jersey/Caribbean Division, Office of Family Supportive Services, dated April 11, 2001.

32. It is clear, then, that the Plaintiff, as director of the Head Start Program, was a permanent employee who did not perform functions involving the shaping or modification of public policy or functions that could influence or be considered in close propinquity to policy making employees or otherwise had access to confidential information. Moreover, the Head Start Performance Standards expressly forbids the consideration of political bias or favoritism in the administration of Head Start personnel. 45 C.F.R. § 1304.60 (f).

33. The discriminatory environment against the Plaintiff began as early as December 17, 2024, during the Municipality's transition process. On that day, Plaintiff received notice from Finance Director and Outgoing Committee Chair. Miguel Clemente, Geigel-Pérez's municipal Finance Director and a member of the outgoing transition team, that Defendant Trujillo-Plumey's transition team would be visiting the Head Start center on December 18, 2025. Plaintiff was also informed that Gloria de Llovio and Luis Matos would be in charge of the Head Start transition process. Later on, Plaintiff learned that Orlando Cintrón-Negrón (hereinafter "Cintrón-Negrón"), Izael Santiago and attorney Martha Vera (hereinafter "Vera"), would also be part of the Head Start incoming transition team. Plaintiff promptly met with her managers, coordinators, specialists and

supervisors to coordinate the visit and provide all the information the incoming team could need. On December 18, 2024, Plaintiff and the Head Start management team were waiting for the incoming transition team visit but, without further notice or communication, they never showed.

34. Finally, on December 20, 2024, the incoming transition team visited the Head Start center. Plaintiff and her managerial team were prepared to cooperate and answer any questions from the incoming transition team. Immediately, Cintrón-Negrón told the Plaintiff that the incoming transition team members wanted to meet with her and asked her questions alone before meeting with the rest of the administrative team. Plaintiff met with the members in her office. The private meeting was hostile from the beginning and the questions centered mostly on her background and how she came to direct the Head Start program in Humacao. At one point, incoming team member Vera inquired about human resources transactions that occurred before the Martínez-Rivera

35. On or around January 16, 2025, Trujillo-Plumey showed up with her staff at the Early Head Start center on Palma Hill, which housed the administrative offices on the second floor. The Plaintiff was not given prior notice of the visit but immediately acted to welcome the mayoress. During the meeting, defendant Trujillo-Plumey stated that she was a social worker and had worked for years at the Puerto Rico Department of the Family (in Spanish "Departamento de la Familia"), and in what was perceived a warning tone, explained that she had a close communication with the federal government and that she would be the program's Governing Board president.

36. As director of the Head Start program and having found that the program's legal issues were not prioritized by the legal division of the Municipality, Martínez-Rivera had contracted the services of attorney Raúl Santiago. Mr. Santiago is a known NPP supporter and activist. On or about January 17, 2025, the Plaintiff received an email from Rose Nieves-Ruiz with an attached letter advising her that effective immediately, Mr. Santiago's contract was null, despite the fact that the contract was in force until May 31, 2025. No further information was given on how the program's legal issues, including an upcoming hearing, would be addressed. Efforts by the

Plaintiff to follow up were not answered. On the day of the hearing, an attorney from the Municipality appeared and told the Plaintiff that he had been told to be there only the day before.

37. On or about January 21, 2025, the plaintiff and the program's staff tried to obtain the new artwork and logos of the Municipality to incorporate in the program's stationary and the like. The Municipality did not respond. Ultimately, Magaly Hernández-Félix (hereinafter "Hernández-Félix"), fiscal officer of the Program, received the logo to be used by her personnel. When the Plaintiff inquired about the logo, Hernández-Félix explained that she had received the logo from the Municipality's human resources director but was told not to share it other employees at the program.

38. On or about January 24, 2025, the Plaintiff decided to conduct a poll on the quality of services after receiving various complaints from the education area regarding Briseida Benitez. However, when the Plaintiff met with education area personnel and asked about their experiences, no one would speak. The Plaintiff was later told by Mr. Kelvin González, maintenance area supervisor at the program and a supporter of the PDP, that Briseida Benítez had helped Trujillo-Plumey in her campaign and was lobbying her to obtain a promotion to a higher position at the program.

39. Early in the morning of or about January 27, 2025, the Plaintiff was informed that there was a bad smell around one of the program centers. The Plaintiff made every effort to coordinate with the Municipality for the sake of the children but received no word. Only when Kelvin González, a PDP supporter, called the Municipality was a response received.

40. On or about January 28, 2025, the Plaintiff received a memo from the federal government limiting the program's budget and ability to offer services. The Plaintiff tried to get in touch with the Municipality's administrator, defendant Cintrón-Negrón, to schedule a meeting with him and the Mayoress without success. This was now a pattern of attempts by the Plaintiff to perform her duties in conjunction with the new PDP municipal administration but receiving no response.

Measures to address the federal government's determination, decisions that would directly impact the program, were discussed at the municipal level without the input or participation of the Plaintiff. In the afternoon, the Plaintiff received a call from Luis Matos, finance and government programs advisor to the mayoress, asking her whether the program's payroll had been met. The Plaintiff answered that it had been and asked for a meeting to discuss these issues as well as the need for the mayoress to appoint a program Governing Board. The Plaintiff was told that he would visit the program and meet with her on January 30, 2025, but he never showed up. Calls to Cintrón-Negrón to follow up went unanswered.

41. On or about February 5, 2025, the Plaintiff received a call from Cintrón-Negrón summoning her to city hall. When she arrived, she saw program employees existing a city hall office without being informed that they had been summoned as well. The municipal secretary, Izael O. Rodríguez, handed the Plaintiff a letter whereby the Trujillo-Plumey appointed to the Governing Board fellow defendants Gladys Flecha-Delgado, Rose Nieves-Ruiz, Antonia Morales-Concepción, and Edwin López-Nieves. The Plaintiff was also informed that the corporation POLIMAT, LLC, presided by Luis Matos, was contracted to reinforce the human resources of the program. Moreover, the Plaintiff was informed that Cintrón-Negrón was appointed as liaison between the program and the Municipality. Martínez-Rivera advised that Gladys Flecha-Delgado could not be part of the Governing Board given that her sister worked at the program. Although at that time she was rudely rebuffed by Luis Matos, the situation had to be corrected as the Plaintiff had indicated a couple of days later.

42. On or about February 18, 2025, the Plaintiff was called to a meeting with Luis Matos at the Municipality. The meeting was recorded but the Plaintiff was not informed beforehand. The meeting centered on an extension proposal that had to be submitted during the third year of the current proposal, in this case by February of 2025. Plaintiff and the program staff had begun to work on the extension proposal but were asked whether an independent proposal writer would be

contracted for that purpose. The program team explained that ordinarily a proposal writer was contracted and that it had been budgeted. Ultimately, the Plaintiff and her team had to draft the extension proposal on their own because the Municipality did not authorize an independent proposal writer. The proposal process was particularly difficult because Luis Matos and other municipal officers reviewed the draft and insisted on making changes but then were not clear about how.

43. On or about February 21, 2025, the program's subdirector, Rafaela Toro, was called by Tatiana Mercado, the president of the Parents Council, and told that Cintrón-Negrón had called her to schedule a meeting. Up until this point, however, Trujillo-Plumey had not met directly with the Plaintiff.

44. In late February of 2025, the Plaintiff received a call from Kelvin González. He told her that Cintrón-Negrón had summoned him to a meeting to discuss some contracts from services from the program. Also, Kelvin González told the Martínez-Rivera that Cintrón-Negrón had told him that he had made sure the Plaintiff had not seen him at city hall when they met, to which Kelvin González responded that he had no problem with the Plaintiff. This reflects a continuing pattern by defendants of meeting with program staff directly without meeting with the Plaintiff.

45. On or about February 26, 2025, the new Governing Board held its first meeting. Customarily, the program director is present during the Board meeting to report on the program's progress and answer any questions a Board member may have. Also, director's secretary is in charge of taking and safeguarding the minutes of the meeting. In this case, the new Board president, Trujillo-Plumey, began the meeting by telling the Martínez-Rivera that they had their own agenda and that she had to leave the meeting and wait in her office to be called. Plaintiff followed the instructions given and waited in her office until Trujillo-Plumey called and instructed her to gather the program supervisors and administrators so the Board members could meet them. Plaintiff gathered and introduced her team and stayed for the meeting. Trujillo-Plumey then

discussed the extension proposal. The mayoress then chastised the Plaintiff, pointing a finger at her, about having finished the proposal and giving the Board only a day to review it. Martínez-Rivera explained that the draft of the proposal had been submitted before the deadline set by Luis Matos, who had been imposed by the Municipality upon the program as an adviser. Regardless, the minutes of the meeting later reflected, wrongfully, that the Plaintiff submitted the draft of the proposal late. The final version of the proposal was submitted on time.

46. On March 18, 2025, the Plaintiff's secretary received a call from city hall asking for the Plaintiff's and Briseida Benítez's email address. Although the Plaintiff waited for an email all day long, it was not sent until the following day. The email from Cintrón-Negrón included an attached letter concerning supposed complaints by Briseida Benítez against Martínez-Rivera. These complaints had not been raised with the Plaintiff directly. Important documents necessary for the proper operation of the program were also withheld for days and weeks at times by defendants in the Municipality.

47. On or about April 30, 2025, just before the Governing Board meeting, the Plaintiff approached Edwin López, a member of the Board, and told him that she had been trying to get in touch with his wife, who was the Protocol Director, for some time but she never answered her calls. Edwin López told the Plaintiff that this whole situation made him uncomfortable and that his wife would not answer the Plaintiff because "there were instructions from up on high not to answer your calls".

48. On or about May 18, 2025, the Plaintiff attended an activity at the Rio Abajo Head Start center and ran into a municipal legislator for the PDP, Judith de-León, whose granddaughter was in the center. Judith de-León told the Plaintiff that she had to get someone from the PDP to work in the program who knew and liked the Plaintiff because "they" wanted to remove her. Judith de-León indicated that she had told defendant Trujillo-Plumey that the Plaintiff was very good and hard-working but that Trujillo-Plumey answered that the Plaintiff could be very good but she did

not support the PDP.

49. On May 30, 2025, the Plaintiff was called from the human resources office of the Municipality and told that she personally had to go and pick up a letter there. The letter was signed by defendant Trujillo-Plumey and informed the Plaintiff that her employment would not be renewed effective May 31, 2025. Coincidentally, when the Plaintiff returned to her office, the president of the Parents' Council called the subdirector and was informed of what had happened. The president of the Parents' Council, Tatiana Mercado, explained that the decision to dismiss the Plaintiff was illegal because it had not been discussed or approved by them. Tatiana Mercado hastily contacted a majority of the members of the Parents' Council and met with them. Together, 11 of the 17 members of the Parents' Council objected to the Plaintiff's dismissal and sent defendant Trujillo-Plumey a copy of the minutes opposing her decision. Tatiana Mercado also told the Plaintiff that her dismissal must be the reason why Cintrón-Negrón had been constantly her recently and asking her to call for an emergency meeting of the Council. The meeting was held on January 3, 2025, and defendants Trujillo-Plumey and Cintrón-Negrón told the Council members that the decision was based on the Plaintiff's late submittal of the extension proposal. This was a pretext given that the Plaintiff did not submit the program's extension proposal late. They also alleged that the Plaintiff did not meet the minimum requirements for the position. However, Plaintiff's appointment was reviewed and approved by the federal government and no problems were identified.

**V. FIRST CAUSE OF ACTION – VIOLATIONS TO FIRST AMENDMENT RIGHTS UNDER THE CONSTITUTION OF THE UNITED STATES**

50. All previous factual allegations are incorporated heretofore.

51. The First Amendment of the Constitution of the United States establishes the right of all citizens to freedom of speech, freedom of expression, freedom of assembly and petition to the

Government for redress.

52. Black letter law and jurisprudence have long established that government bodies and/or officials cannot take adverse employment actions against employees on the basis of political affiliation. Likewise, the First Amendment protects citizens from suffering adverse employment consequences under color of state law in retaliation for engaging in political activity.

53. It is clear from the evidence that the Plaintiffs' First Amendment speech and related activities were the motivating factors in the adverse employment actions complained of herein. By subjecting Plaintiff to adverse employment actions and/or retaliating against her on the basis of political affiliation, and/or for engaging in political activity, defendants deprived Plaintiff of her First Amendment Rights.

### VI. SECOND CAUSE OF ACTION – DUE PROCESS

54. All previous factual allegations are incorporated heretofore.

55. The Due Process Clause of the Constitution of the United States requires notice and an opportunity to be heard when the state seeks to deprive a person of a property interest.

56. Plaintiff in the case before us had a permanent position within the Program, as described by its own regulations. Plaintiff had a proprietary right over her employment and a reasonable expectation of continued employment.

57. Defendants summarily dismissed the Plaintiff without cause, prior hearing, an informal hearing shortly thereafter, and without a formal procedure or hearing. Also, Plaintiff was terminated without adequate prior notice, much less a valid explanation of the reasons for the termination or review mechanisms. Plaintiff's job performance was not reviewed by Defendants prior to her termination and previous reviews had been consistently favorable. Plaintiff was not afforded a real opportunity to be heard before the decision to dismiss her was made. Defendants acted with intent to deprive the Plaintiff of her Due Process rights because, otherwise, they would

not have been able to terminate the Plaintiff.

58. As a result, Defendants deprived Plaintiff of the rights afforded by the Due Process Clauses of the Fifth and/or Fourteenth Amendments to the Constitution of the United States.

### VII. THIRD CAUSE OF ACTION – INJUNCTIVE RELIEF

59. All previous factual allegations are incorporated heretofore.

60. The allegations set forth herein establish a clear case of political discrimination incurred by Defendants against Plaintiff. Defendants in their official capacity are liable for injunctive relief. To wit, Plaintiff respectfully avers that she is entitled to reinstatement in her position within the Municipality, and to any other injunctive relief this Honorable Court deems adequate.

### VIII. FOURTH CAUSE OF ACTION – TORT ACTION UNDER PUERTO RICO LOCAL LAW

61. All previous factual allegations are incorporated heretofore.

62. Defendants' actions also constitute a violation of Plaintiff's rights secured by Article II, Sections 1, 2, 4, 6 and 7 of the Puerto Rico Constitution.

63. Defendants' actions also constitute violations of Puerto Rico's Public Service Personnel laws; Law No. 131 of May 13, 1943, P.R. Laws Ann., Tit. 1, § 13-19; Puerto Rico's Local Law 100; and Articles 1802 and 1803 of the Civil Code, § 5141-5142 of Title 31.

### IX. JURY TRIAL

64. All previous factual allegations are incorporated heretofore.

65. Plaintiff requests a jury trial.

### X. PRAYER FOR RELIEF

66. All previous factual allegations are incorporated heretofore.

67. Wherefore, Plaintiff requests the following relief, jointly and severally against all

Defendants:

    a. That this Court determine and declare that the actions by all defendants were in violation of the Constitution and laws of the United States and of Puerto Rico;

    b. Compensatory and punitive damages in excess of $2,000,000.00, said request for compensation is made up of the following amounts:

        i. An amount in excess of $1,000,000.00, as monetary and compensatory damages and backpay;

        ii. Punitive damages in excess of $1,000,000.00 for Plaintiff, due to the malicious and wanton nature of the violations alleged herein.

    c. Equitable relief in the form of a permanent injunction ordering Defendants to reinstate Plaintiff to her position, with all corresponding privileges and benefits, and ordering Defendants to refrain from further engaging in adverse employment action on the basis of political affiliations and beliefs.

    d. Attorneys' fees, costs and litigation expenses incurred in connection to this action pursuant to, inter alia, 42 U.S.C. § 1988, and other applicable statutes.

    e. All applicable interests, including pre- and post- judgment interest.

    f. That the Court retain jurisdiction over this action in order to ensure compliance with any decree issued;

    g. Any such other and further relief as the Court may deem just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this February 20, 2026.

**s/Francisco J. González-Magaz**
**FRANCISCO J. GONZÁLEZ-MAGAZ**
USDC No. 223907
FRANCISCO GONZÁLEZ P.S.C.
1519 PONCE DE LEÓN AVE.
FIRST FEDERAL BLDG. SUITE 802
SAN JUAN, P.R. 00909
Tel. (787) 504-5880
gonzalezmagaz@gmail.com
